CASE 96—PETITION ORDINARY—MAY 28.

# Finnell vs. Meaux.

### APPEAL FROM MERCER CIRCUIT COURT.

1. The vendor of a slave being a creditor on a note for the price of the slave, with personal security against the estate of the deceased purchaser, after the purchaser's death, took possession of, and had said slave in his service, and listed him for work on the military railroad in 1863. If he converted said slave, he is liable for his value at the time of conversion, and for reasonable hire whilst in his possession after the vendee's death. If he illegally took possession, and by reason thereof the slave ran away and made his escape, he is liable to the extent he actually damaged the estate by so doing; and as he became the executor of his own wrong, to the extent he illegally interfered with the assets of decedent's estate, the amount and value of such assets in his hands should be regarded as a payment on his debt, and the surety should be permitted to set it up as an offset, not as a mere trespass, but as assets in his hands as executor of his own wrong.

2. An executor *de son tort*, is to be sued, and is liable as other executors; and defenses to their individual claims, can be used, as though, they were rightful executors.

JOHN B. THOMPSON,
E. J. POLK, and
P. B. THOMPSON,                                     For Appellant,

CITED—

*Civil Code*, secs. 126, 111 ; 3 *Bibb*, 517, 348.

2 *J. J. Marshall*, 71, 86.

*Rev. Stat.*, chap. 93, art. 1, sec. 6, 2 *Stant.*, 360.

18 *B. Mon.*, 567 ; *Kyle & Wise vs. Dunlap.*

*MSS. Opn.*, Jan., 1858 ; *Johnson vs. Ballard.*

VOL. III—29

W. A. Hooe and
James D. Hardin,　　　　　　　　　　　　　For Appellee,

CITED—

*Hardin*, 180 ; 2 *Bibb*, 428.

4 *J. J. M.*, 275 ; 3 *Bibb*, 346.

1 *Dana*, 325 ; 1 *B. Mon.*, 241.

*Civil Code*, secs. 377, 653.

1 *J. J. M.*, 449 ; 3 *Mar.*, 397.

2 *Met.*, 582 ; *Vance and wife vs. Vance.*

15 *B. Mon.*, 459–60 ; *Tinsley vs. Tinsley Hardin.*

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

This was a suit by appellant on a note for nine hundred dollars, payable to his order, dated November 23d, 1861, due one day thereafter, and signed by Sally Meaux and appellee, both free persons of color. Although the bill of sale, by appellant to Sally Meaux, for a slave, William Henry, is not made part of the evidence, nor copied in the record, yet the note states the consideration to be " for a negro man, William Henry, this day purchased."

And in appellant's reply to appellee's counter-claim, he avers that said William Henry was sold and conveyed to said Sally Meaux, who was a free woman of color, and the wife of said William Henry, and that appellee was her father; that said Sally died in the year 1863, leaving no heirs capable of holding her said husband. The defendant asked and obtained an instruction from the court to the jury, " that, by the bill of sale from plaintiff, Finnell, to defendant's daughter for the boy William Henry, mentioned in the note sued on, the title passed to the daughter of defendant, Sarah, a free colored person."

The plaintiff, in his reply, prayed the court to cause defendant to file the bill of sale, alleging that he had it.

Under these circumstances, it must be regarded that Sally Meaux was the wife of William Henry, and bought him from Finnell; and that appellee, her father, went her security for the payment of the money.

It is proved that she died in 1863, and that soon thereafter William Henry was at work at plaintiff's house; but how he got possession is not shown, nor whether by the mere consent of William or the appellee. Finnell avers it was by the latter.

There were efforts at compromise after Sally's death between her father and Finnell, but they disagreed. William was then at work on plaintiff's farm. The only evidence of Finnell's assertion of ownership consists of his listing William Henry to work on railroads, under the military orders of General Fry, in the year 1863; but Finnell then explained the situation of the title, and said it was in controversy, and he did not know to whom he did belong, but finally listed him.

Finnell asked Humphrey Meaux four hundred dollars to cancel the contract after Sally's death, and he offered only fifty dollars; so it is quite evident that no cancelment ever did occur, nor could Humphrey Meaux legally conset thereto.

By *section* 6, *article* 1, *chapter* 93, 2 *Stanton's Revised Statutes*, 360, it is enacted, that " no free negro shall be capable of acquiring in fee, or holding or owning for any length of time, as hirer or otherwise, any slave other than the husband, wife, parent, or descendant of such free negro."

As decided by this court in *Kyler and Wise vs. Dunlap* (18 *B. Mon.*, 567), this permission to the free colored husband, wife, parent, or descendant to purchase and hold their slave husband, wife, parent, or descendant, did not free such slave when so purchased, but permitted free col-

ored persons sustaining these relations to slaves to pur-
chase and hold them; therefore, William Henry was still
the slave of his free wife, Sally, when she died, and sub-
ject to be administered and sold by her representative to
pay her debts. The illegal interference of any one with
this, as well as any other part of her estate, would make
them liable as executor *de son tort* to the creditors to the
extent of such conversion and injury.

As Finnell himself was a creditor, if he illegally took
possession of the slave William Henry, and, by reason of
his listing him to work on the military railroads, said
slave ran away and escaped, still he would be liable to
the extent he actually damaged the estate by so doing,
and this could, to that extent, be set up by the surety of
the decedent as a defense, but no further.

The utmost defense, by reason of the conversion, would
be the reasonable value of the slave, William Henry, at
the time Finnell took possession of and converted him,
together with reasonable hire whilst in his possession,
after Sally's death.

The legal rights of Humphrey Meaux to set up as a
defense to the note the conversion by Finnell of the
slave William Henry, in nowise depends upon his being
either the heir or representative of his deceased daugh-
ter, nor whether he could at all legally hold, in his own
right, said slave William Henry; but it depends on the
liability of Finnell in reducing the assets of his deceased
daughter's estate, and thereby throwing upon him an
additional responsibility as her surety. And as Finnell
became executor in his own wrong, to the extent he ille-
gally interfered with the assets of decedent Sally's estate,
the amount and value of such assets in his hands should
be regarded as a payment on the debt he holds against
her and her father, and the latter should be permitted to

set it up as an offset, not as a mere trespass, but as assets to that extent in his hands as executor of his own wrong.

It is said in the books that an executor, *de son tort*, is to be sued, and is liable as other executors; and, of course, defenses to their individnal claims can be used as though they were rightful executors.

The defenses, much of the· evidence, and several instructions, given over appellant's objections, were foreign from, and conflicting with, these principles, and misleading, hence the erroneous verdict and judgment.

Humphrey Meaux, not having administered upon his deceased daughter's estate, he had no legal authority to cancel the contract and transfer the title of the slave, William Henry, to Finnell; therefore, such issue was immaterial; nor could Finnell's possession, however tortious, rescind the contract; therefore, upon the return of the cause, the parties should be permitted to amend their pleadings so as to conform to the facts, and make such issues as may be legally cognizable.

Wherefore, the judgment is reversed, with directions for further proceedings as herein indicated.